IKUTA, Circuit Judge:
A crew member employed by the Alaska Marine Highway System (AMHS) was seriously injured while attempting to operate a permanent passenger ramp extending from the Port of Bellingham's terminal building to an AMHS ferry. Because the permanent passenger ramp in this case is an extension of the land, and the Admiralty Extension Act (AEA), 46 U.S.C. § 30101, does not apply to an injury caused by land-based equipment, we affirm the district court's ruling that maritime law does not apply.[1]
I
AMHS, an entity of the State of Alaska, currently operates commercial ferries at 36 ports that it owns or leases. In 1988, the Port successfully submitted a proposal to AMHS to construct a marine terminal for AMHS's use in Bellingham, Washington. The Port designed the Bellingham Cruise Terminal (BCT) to meet AMHS's requirements. Per AMHS's specifications, the BCT included a passenger ramp and a vehicle ramp to load and unload ferries.
As part of the BCT's design, the passenger ramp is an integral part of the structure of the ferry berth facilities. See Appendix, p.2. The passenger ramp is built into the terminal building, with one end extending approximately 75 feet over the dock. See Appendix, p.2. A retractable "apron" connects the end of the ramp to a vessel. See Appendix, p.1. The ramp is controlled by 3/4-inch thick wire cables, which extend from a steel tower on the BCT dock to the far end of the ramp. The ramp is locked in place by pins that slot into two long bars. In order to change the ramp's position, an operator uses the ramp's control panel to unlock the pins and then raise and lower the cables. Attempting to lower the ramp when it is in the locked position creates slack in the cables. If the operator creates such slack and then unlocks the pins, the ramp will drop until the cables catch the slack.
The Port leased portions of the BCT facilities to AMHS under a 20-year lease agreement, beginning in 1989 when the BCT was completed. In 2009, the Port and AMHS renewed the lease for another 15 years.
*1125 On November 2, 2012, Shannon Adamson was working as a crew member on the AMHS ferry M/V Columbia, which had docked at the BCT that morning. Adamson was asked to lower the passenger ramp to load passengers from the terminal to the ferry. While she was operating the ramp, it fell 15 feet, breaking the cables and collapsing all the way to the pier. Adamson suffered serious injuries from the incident.
Adamson filed this suit against the Port in federal district court under diversity jurisdiction, alleging that the Port negligently caused her injuries under maritime law.[2] In its answer, the Port asserted as an affirmative defense that negligent supervision and training by AMHS personnel, including the crew of the M/V Columbia, was partly responsible for Adamson's injuries. The Port then moved for partial summary judgment, arguing in part that maritime law did not apply to Adamson's claims. The district court agreed, and subsequently denied Adamson's motion for reconsideration. The case proceeded under Washington state law. After a ten-day trial in March and April 2016, a jury found the Port liable under various Washington law theories of negligence. The district court denied the Port's post-trial motions for judgment as a matter of law or a new trial.
The Port timely appealed the jury verdict and the district court's denial of its post-trial motions. Adamson timely cross appealed, arguing that the district court's ruling that maritime law did not apply was erroneous.
II
Pursuant to Adamson's cross appeal, we consider here whether the district court correctly applied Washington law rather than maritime law.[3] We review de novo a district court's determination that maritime jurisdiction, and therefore substantive maritime law, does not extend to a tort claim. H20 Houseboat Vacations Inc. v. Hernandez , 103 F.3d 914, 916 (9th Cir. 1996). We have jurisdiction under 28 U.S.C. § 1291.
A
We begin by reviewing the legal framework for determining whether maritime law applies to a tort claim.[4]
Plaintiffs may bring maritime law claims under either diversity jurisdiction, 28 U.S.C. § 1332, or admiralty jurisdiction, 28 U.S.C. § 1333.[5]
*1126 Victory Carriers, Inc. v. Law , 404 U.S. 202, 204, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Under either jurisdictional statute, "federal maritime law govern[s]" if the claim comes "within the admiralty and maritime jurisdiction conferred on the district courts by the Constitution and the jurisdictional statutes." Id. ; see also Kermarec v. Compagnie Generale Transatlantique , 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In other words, if the district court could have maritime jurisdiction over a tort claim, "[s]ubstantive maritime law controls" the claim, "whatever the forum or asserted basis of jurisdiction." Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp. , 982 F.2d 363, 366 n.1 (9th Cir. 1992).
Maritime law applies to a tort if two conditions are met. First, the "location" test requires us to determine "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." In re Mission Bay Jet Sports, LLC , 570 F.3d 1124, 1126 (9th Cir. 2009) (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co. , 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995) ). While this test historically served "as the exclusive test of admiralty tort jurisdiction," the Supreme Court has recognized an additional requirement: a nexus to maritime activity. Exec. Jet Aviation, Inc. v. City of Cleveland , 409 U.S. 249, 261, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). The nexus requirement avoids sweeping into admiralty jurisdiction wholly unrelated torts, such as airplane crashes over water. Id. at 268, 93 S.Ct. 493. Thus, maritime torts must also satisfy a "connection" test, which requires that the tort have a "significant relationship to traditional maritime activity." In re Mission Bay Jet Sports, LLC , 570 F.3d at 1126 (quoting Foremost Ins. Co. v. Richardson , 457 U.S. 668, 674, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) ). Here, the Port agrees that Adamson's tort claim bears the requisite connection to maritime activity, so we focus on the locality where the asserted tort occurred.
B
For purposes of maritime law, "[p]iers and docks [have been] consistently deemed extensions of land; injuries inflicted to or on them were held not compensable under the maritime law." Victory Carriers , 404 U.S. at 206-07, 92 S.Ct. 418 (footnote omitted). Structures such as "bridges, shore docks, protection piling, piers, etc., pertained to the land" because they were "connected with the shore and immediately concerned commerce upon land." Cleveland Terminal & Valley R.R. Co. v. Cleveland S.S. Co. , 208 U.S. 316, 321, 28 S.Ct. 414, 52 L.Ed. 508 (1908). "None of these structures were aids to navigation in the maritime sense, but extensions of the shore and aids to commerce on land as such." Id. ; see also Rodrigue v. Aetna Cas. & Sur. Co. , 395 U.S. 352, 360, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) (concluding that admiralty jurisdiction did not extend to accidents on artificial islands because "the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers"); Cope v. Vallette Dry-Dock Co. , 119 U.S. 625, 627, 7 S.Ct. 336, 30 L.Ed. 501 (1887) (explaining that a fixed structure, such as a dry-dock, is not used for the purpose of navigation any more so than a wharf or warehouse that projects upon water).
While piers and docks are considered extensions of the land, a gangway or gangplank is part of a vessel; thus, injuries on gangplanks are deemed to have occurred on navigable waters. The Admiral Peoples , 295 U.S. 649, 651-52, 55 S.Ct. 885, 79 L.Ed. 1633 (1935).[6] In *1127 The Admiral Peoples , the steamship owner had placed a 2-foot by 18-foot plank from the vessel to the dock, and a passenger was injured in a fall from the plank. Id. at 650, 55 S.Ct. 885. The Admiral Peoples reasoned that the gangplank at issue "was a part of the vessel's equipment which was placed in position to enable its passengers to reach the shore," and that "[i]t was no less a part of the vessel because in its extension to the dock it projected over the land." Id. at 651-52, 55 S.Ct. 885. While the plaintiff "was on the gangplank, she had not yet left the vessel," id. at 652, 55 S.Ct. 885, and therefore, the plaintiff's injury was within maritime jurisdiction, id. ; see also Victory Carriers , 404 U.S. at 207, 92 S.Ct. 418 (noting that while piers and docks are extensions of land, maritime law applied to gangplanks, which "served as a rough dividing line between the state and maritime regimes").
In light of The Admiral Peoples 's gangplank rule, we have deemed gangplank incidents to be subject to admiralty jurisdiction and maritime law. See The Shangho , 88 F.2d 42, 42 (9th Cir. 1937) (holding that maritime law applied to a longshoreman's claim that he was injured when he fell from a gangplank that had been unlashed from the ship because the "gangplank is part of the ship when it is being used for the purpose of furnishing ingress and egress to and from the ship"). We have applied this gangplank rule to such injuries even when the gangplank was not part of the ship's equipment. See Solano v. Beilby , 761 F.2d 1369, 1370-71 (9th Cir. 1985) (holding that maritime law applied to a longshoreman's claim that he was injured on a ramp to a ship while attempting to load a vehicle from the dock, even though the ramp was provided by his employer, a stevedoring company).
We have not had much occasion, however, to consider when the gangplank rule applies to other sorts of connecting equipment used for access to vessels to and from the shore. Several courts have held that temporary connecting equipment used for such access is analogous to gangplanks and therefore subject to admiralty jurisdiction. See Tullis v. Fid. & Cas. Co. of N.Y. , 397 F.2d 22, 24 (5th Cir. 1968) (reasoning that "a row of pilings connected to shore by a single plank over nine or ten feet of water" was not "in any way analogous to a fixed pier or wharf" and "could be considered a part of the vessel's equipment in lieu of the usual or customary gangplank"); Mich. Mutual Liab. Co. v. Arrien , 344 F.2d 640, 642, 644 (2d Cir. 1965) (determining that "a removable wooden, rectangular platform, approximately six feet by ten feet" was more analogous to a gangplank than a permanent pier or wharf).[7]
By contrast, there is a circuit split on the question whether the gangplank rule applies to permanent, land-based equipment used for access to a vessel to and from the shore. In the leading circuit case *1128 on the issue, the Fifth Circuit held that the gangplank rule did not apply to a permanent land-based ramp. See Parker v. S. La. Contractors, Inc. , 537 F.2d 113, 115-16 (5th Cir. 1976). In Parker , a truck driver was injured on a ramp connecting a barge to a landing and sued the barge owner and lessee, as well as the owner of the landing and another third party. Id. at 115. The ramp "weighed several tons, rested on land and had an apron extending over the water's edge which could be raised and lowered by winches to permit ingress and egress from docking barges." Id. Parker contrasted this situation with those involving temporary gangplanks and analogous connecting structures, reasoning that the ramp "rested on land, and removing it would involve a major undertaking calling for heavy equipment." Id. at 116. Accordingly, the Fifth Circuit concluded that, "[u]nlike a gangplank, [the ramp] cannot reasonably be conceived as an appurtenance of the barges that use it for docking," and therefore the injury did not occur at a maritime locality. Id.
The Fourth Circuit reached the same conclusion regarding a moored fuel flat used to cross from the dock to vessels.[8] Russell v. City Ice & Fuel Co. of Point Pleasant , 539 F.2d 1318, 1319 (4th Cir. 1976). Russell reasoned that the flat "was floating, but more or less permanently moored to the shore, and it constituted the principal portion of the dock." Id. at 1320. While the flat was still capable of use as a vessel, the Fourth Circuit concluded that "[a]s long as such a structure is securely affixed to the land and is in use as a component of the shore facilities, it is not a vessel in navigation, but a dock." Id. at 1321. Both the Fourth and Fifth Circuits thus rejected a per se rule that the gangplank rule applies to any equipment used to provide access to and from a vessel.
Contrary to these two circuits, the First Circuit held that the gangplank rule applies to any equipment providing the means of ingress to and egress from a vessel. See Romero Reyes v. Marine Enters., Inc. , 494 F.2d 866, 867 (1st Cir. 1974). In Romero Reyes , a longshoreman sued a barge owner for injuries suffered on a "gangway, which was permanently affixed to a pier-based tower and did not belong to the barge." Id. The gangway was "[s]uspended from a tower on pilings next to the dock" and "could be raised or lowered by cables attached to the tower." Id. at 869. Romero Reyes concluded that maritime law applied to this accident, reasoning that "[b]ecause the means of ingress or egress, by whomever furnished, are an 'appurtenance' of the vessel, the [vessel] owner has a duty of care regarding them." Id. at 870.[9]
Although we have not directly addressed this issue, we have indicated our disagreement with the First Circuit's per se rule. See Scheuring v. Traylor Bros., Inc. , 476 F.3d 781, 789-90 (9th Cir. 2007). In Scheuring , we considered a claim involving an injury suffered when the plaintiff was lifting a "20-foot ramp leading from the water's edge to an offshore float," from which crew members would use a skiff to reach a barge. Id. at 784. The ramp, which weighed 180 pounds, "could not be affixed to the float, and, on average, a few times a *1129 week it would fall into the water." Id. We noted several cases enunciating a per se rule "that a gangway or ramp which is 'necessarily used for embarking or disembarking' becomes 'a basic appurtenance of the vessel.' " Id. at 790 (quoting Sarauw v. Oceanic Navigation Corp. , 655 F.2d 526, 528 (3d Cir. 1981) and citing Romero Reyes , 494 F.2d at 869 ). But rather than adopt this rule, we concluded that "[t]here is a genuine issue of material fact whether the ramp ... is more like a gangway than a dock or pier." Id. at 789-90.
We now join the well-reasoned conclusion of the Fourth and Fifth Circuits, and reject the First Circuit's rule that any equipment used to access a vessel is a gangplank that is subject to admiralty jurisdiction. There are several reasons for doing so. First, our conclusion is consistent with Supreme Court precedent, which has not indicated that every case involving a structure or piece of equipment used for access to a vessel falls within admiralty jurisdiction. Specifically, in T. Smith & Son v. Taylor , the Supreme Court considered an accident that occurred when a longshoreman unloading a vessel was killed by a fall from "a stage that rested solely upon the wharf and projected a few feet over the water to or near the side of the vessel." 276 U.S. 179, 181, 48 S.Ct. 228, 72 L.Ed. 520 (1928). The plaintiff there conceded that both the stage and the wharf were extensions of land. Id. at 181-82, 48 S.Ct. 228. The Supreme Court agreed, concluding that maritime jurisdiction was lacking because the injured worker had been struck while on the stage, and therefore on land. Id. at 182, 48 S.Ct. 228. Further, admiralty jurisdiction does not necessarily apply to injuries caused by equipment used to load or unload a ship. See Nacirema Oper. Co. v. Johnson , 396 U.S. 212, 213, 223, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969) (admiralty jurisdiction does not apply to the injuries suffered by a longshoreman who was working on a pier permanently affixed to the shore and caused by pier-based crane being used to load a ship) (construing the pre-1972 LHWCA, see supra 1127 n.7).
Moreover, the historical justification for the gangplank rule was that the gangplank was actually carried by the vessel as "a part of the vessel's equipment." The Admiral Peoples , 295 U.S. at 651-52, 55 S.Ct. 885 ; see also Victory Carriers , 404 U.S. at 213, 92 S.Ct. 418 (noting that a purported maritime claim was particularly attenuated where, in part, the plaintiff "was not injured by equipment that was part of the ship's usual gear or that was stored on board"); O'Keefe v. Atl. Stevedoring Co. , 354 F.2d 48, 50 (5th Cir. 1965) (explaining that a gangplank was "traditionally, if no[t] always so in fact, a part of the equipment of the ship"). Although courts, including ours, have extended this rationale to gangplanks and other analogous temporary equipment that is not carried by the vessel, see, e.g. , Solano , 761 F.2d at 1371 ; Tullis , 397 F.2d at 24, we agree with the Fifth Circuit that when the ramp at issue is a permanent part of the shore facility, affixed to the shore, and bearing little resemblance to a "moveable platform or bridge" capable of being carried with a vessel, Webster's Second New International Dictionary 1032, it "cannot reasonably be conceived as an appurtenance of the [vessels]" that use it, Parker , 537 F.2d at 116.
Finally, the rationale for the per se rule in Romero Reyes derives in part from the vessel owner's duty to provide a safe means of access to and from the shore. Romero Reyes reasoned that the duty of seaworthiness "includes providing [crew members] with a suitable means to board and disembark," and that this duty "extends to the gangway by whomever supplied, owned, or controlled." 494 F.2d at 869. Romero Reyes concluded that because *1130 this duty made the gangway at issue "an 'appurtenance' of the vessel," the vessel owner's duty of care required the owner to inspect the gangway and warn against apparent defects. Id. at 870. The duty of seaworthiness does not apply to the Port in this case. See Fla. Fuels, Inc. v. Citgo Petroleum Corp. , 6 F.3d 330, 332 (5th Cir. 1993) ("It is well-settled, however, that the doctrine of 'seaworthiness' is not applicable to a dock owner who does not occupy the position of owner or operator of the vessel.").
Having rejected the First Circuit's per se rule, we follow Scheuring 's guidance and hold that courts must consider, on a case-by-case basis, whether the equipment at issue is analogous to a gangplank and therefore subject to admiralty jurisdiction, or is a permanent land-based structure subject to state law.
C
While our analysis above can guide us in determining whether the asserted tort occurred over the water or on land, this is not the end of the voyage for admiralty jurisdiction. In 1948, Congress enacted the AEA, which provides that "[t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a). Congress passed this law "specifically to overrule or circumvent" a line of Supreme Court cases that had "refused to permit recovery in admiralty even where a ship or its gear, through collision or otherwise, caused damage to persons ashore or to bridges, docks, or other shore-based property." Victory Carriers , 404 U.S. at 209, 92 S.Ct. 418.
Interpreting this Act, the Supreme Court has held that a tort may fall within the AEA regardless whether it is "committed by the ship itself" or "by the ship's personnel while operating it." Gutierrez v. Waterman S.S. Corp. , 373 U.S. 206, 210, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). In Gutierrez , a stevedore was injured on the dock while unloading defective cargo containers from a ship when he slipped on loose beans that had spilled from the containers. Id. at 207. Gutierrez held that the AEA applied to the stevedore's negligence claim, noting that the vessel owner "allowed the cargo to be discharged in dangerous and defective bagging," and reasoning that the impact of this action was "felt ashore at a time and place not remote from the wrongful act." Id. at 210-11, 83 S.Ct. 1185.
Applying Gutierrez , we held in Gebhard v. S.S. Hawaiian Legislator that a longshoreman injured on a pier by pier-based equipment could bring a maritime negligence claim against the vessel owner under the AEA. 425 F.2d 1303, 1305-06 (9th Cir. 1970). In Gebhard , an employee of a stevedoring company was directing straddle carriers (large vehicles which moved container vans to the water's edge) into position beneath a crane used to hoist the vans aboard ship. Id. at 1305. The employee was injured when a straddle carrier ran into him and crushed his leg. Id. We reasoned that there was "no substantial difference for jurisdictional purposes between an allegation that the shipowner was negligent in allowing beans to be unloaded by means of dangerously defective bagging, [as in Gutierrez ,] and one that he was negligent in allowing vans to be loaded [on their way onto the vessel] by means of dangerously defective equipment." Id. at 1306. Therefore, we concluded that we had jurisdiction under the AEA. Id.
When we decided Gebhard , however, we did not have the benefit of Victory Carriers , which clarified and narrowed Gutierrez 's scope.
*1131 404 U.S. at 210-11, 92 S.Ct. 418. In Victory Carriers , a longshoreman was injured while driving a forklift loaded with cargo to a point on a pier where the cargo could be hoisted onto a vessel. Id. at 202-03, 92 S.Ct. 418. During this process, the overhead protection rack of the forklift (which was owned by his stevedore employer) came loose and struck him. Id. The Court held that because the longshoreman was injured by alleged defects in his employer's forklift while operating on a pier, federal maritime law did not apply even though the longshoreman was in the process of loading a vessel. Id. at 210-11, 92 S.Ct. 418. Distinguishing Gutierrez , the Court explained that the decision in that case "turned ... upon the fact that [the stevedore's] injury was caused by an appurtenance of a ship, the defective cargo containers," which led to the on-shore injuries. Id. at 210-11. Victory Carriers emphasized that where an individual is "injured on a pier by pier-based equipment," the injury "remain[s] outside the" AEA. Id. at 211, 92 S.Ct. 418 (quoting Nacirema , 396 U.S. at 223, 90 S.Ct. 347 ). Noting that extending admiralty jurisdiction to the injury would "raise a host of new problems as to the standards for and limitations on the applicability of maritime law to accidents on land," Victory Carriers stressed that "[r]eliance upon the gangplank line as the presumptive boundary of admiralty jurisdiction, except for cases in which a ship's appurtenance causes damage ashore , recognizes the traditional limitations of admiralty jurisdiction, and decreases ... arbitrariness and uncertainties...." Id. at 214 & n.14, 92 S.Ct. 418 (emphasis added).
After Victory Carriers , all circuits considering the issue have agreed that "to invoke maritime jurisdiction under the Admiralty Extension Act, a plaintiff injured on shore must allege that the injury was caused by a[n] ... appurtenance of a ship on navigable waters." Margin v. Sea-Land Servs., Inc. , 812 F.2d 973, 975 (5th Cir. 1987) ; see also Garrett v. Gutzeit , 491 F.2d 228, 232 (4th Cir. 1974) (" Victory Carriers and Gutierrez , read and considered together, combine to formulate the following rule: Admiralty jurisdiction extends to shorebased workers who are injured by an appurtenance of the ship at a time and place not remote from the wrongful act of the shipowner."). In other words, when read in light of Victory Carriers , Gutierrez 's statement that admiralty jurisdiction applies to torts committed "by the ship's personnel while operating it," 373 U.S. at 210, 83 S.Ct. 1185, applies only where the injury is "caused by an appurtenance of [the] ship" or the ship itself, Victory Carriers , 404 U.S. at 211, 92 S.Ct. 418. As the First Circuit put it, "[t]he [Supreme] Court's later decision in Victory Carriers ... headed off whatever inclination lower courts might have had to read Gutierrez in as unbounded a manner as the passage [regarding torts committed by the ship's personnel], taken literally, might have sanctioned." Kinsella v. Zim Isr. Navigation Co., Ltd. , 513 F.2d 701, 703-04 (1st Cir. 1975) (holding that the AEA did not apply where the object that caused the injury "was not an appurtenance in relation to plaintiff's injury"); see also MLC Fishing, Inc. v. Velez , 667 F.3d 140, 142 (2d Cir. 2011) (holding that the AEA did not apply when a vessel passenger slipped and fell on a ramp deemed to be an extension of land, and the accident was not " 'caused by' the vessel or its appurtenances."); Scott v. Trump Ind., Inc. , 337 F.3d 939, 944-45 (7th Cir. 2003) (concluding that AEA jurisdiction depended on whether "an appurtenance of the" vessel "proximately caused" the injury); Anderson v. United States , 317 F.3d 1235, 1237 (11th Cir. 2003) (reasoning that whether injuries caused by aircraft dropping bombs were "caused by a vessel" turned on "whether the aircraft is an appurtenance to the" aircraft carrier (first *1132 quoting Grubart , 513 U.S. at 534, 115 S.Ct. 1043 ; and then citing Victory Carriers , 404 U.S. at 210-11, 92 S.Ct. 418 ) ).
The Supreme Court's subsequent decision in Grubart , supports this reading of Victory Carriers and Gutierrez . Grubart involved allegations that a dredging company had negligently caused flooding in a tunnel and numerous buildings. 513 U.S. at 529, 115 S.Ct. 1043. The dredging company had "used a crane, sitting on [its] barge in the river next to a bridge, to drive piles into the riverbed above the tunnel." Id. In examining whether the tort was committed "by a vessel," Grubart explained that "[t]he fact that the pile driving was done with a crane makes no difference under the location test, given the maritime law that ordinarily treats an 'appurtenance' attached to a vessel in navigable waters as part of the vessel itself." Id. at 535, 115 S.Ct. 1043 (citing Victory Carriers , 404 U.S. at 210-11, 92 S.Ct. 418 ; Gutierrez , 373 U.S. at 209-10, 83 S.Ct. 1185 ). The Court went on to hold that proximate causation was the appropriate standard by which to measure whether the damage was "caused" by the appurtenance of the barge. Id. at 537-38, 115 S.Ct. 1043. Of course, had the AEA required only that the tort be "committed ... by the ship's personnel while operating it," Gutierrez , 373 U.S. at 210, 83 S.Ct. 1185, Grubart 's discussion as to whether the crane was an appurtenance of the barge would have been unnecessary, as the AEA would have been satisfied by the allegations that the dredging company's employees were negligent in their pile driving, regardless whether the crane was an appurtenance.
In light of this intervening authority, we conclude that Gebhard 's interpretation of "caused by a vessel" no longer remains good law. See Miller v. Gammie , 335 F.3d 889, 893-94 (9th Cir. 2003) (en banc). We join our sister circuits in holding that, under the AEA, an injury must have been caused by a vessel or its appurtenance. See, e.g. , Scott , 337 F.3d at 944-45. Therefore, the AEA does not extend to injuries "on a pier by pier-based equipment." Victory Carriers , 404 U.S. at 211, 92 S.Ct. 418 (quoting Nacirema Oper. , 396 U.S. at 223, 90 S.Ct. 347 ).[10]
III
We now apply these principles to Adamson's arguments.
Adamson first argues that her injury occurred on navigable waters because the BCT passenger ramp is analogous to a gangplank, and therefore subject to admiralty jurisdiction.
We disagree; there is no genuine issue of material fact as to whether the passenger ramp is a gangplank or analogous to one. Unlike a traditional gangplank, the passenger ramp at the BCT is not equipment carried with the ship. See The Admiral Peoples , 295 U.S. at 651, 55 S.Ct. 885 ; O'Keefe , 354 F.2d at 50. Nor is it a temporary platform or piece of equipment that can be "placed in position to enable its passengers to reach the shore," The Admiral Peoples , 295 U.S. at 651, 55 S.Ct. 885 ; see also Solano , 761 F.2d at 1370-71.
*1133 Rather, the BCT's passenger ramp is a permanent fixture of the onshore terminal facilities. The ramp itself is permanently extended partially over water and, though it is raised or lowered, remains roughly in the same place. Only the apron can be retracted to cover less of the water, and it still remains permanently affixed to land-and dock-based structures. Like the ramp in Parker , the passenger ramp here can only be moved mechanically, "and removing it would involve a major undertaking calling for heavy equipment." 537 F.2d at 116. Given these characteristics, the passenger ramp "cannot reasonably be conceived of as an appurtenance" of the M/V Columbia and other AMHS ferries. Id. Therefore, Adamson's injuries did not occur "on or over navigable waters." Taghadomi v. United States , 401 F.3d 1080, 1084 (9th Cir. 2005).
Alternatively, Adamson argues that even if the passenger ramp is part of the land, the AEA applies because the Port argued as an affirmative defense that AMHS personnel, including the crew of the M/V Columbia, were negligent in their training, supervision, and control of Adamson. Relying on Gutierrez , 373 U.S. at 210, 83 S.Ct. 1185, and Gebhard , 425 F.2d at 1306-07, Adamson reasons that when the negligence of ship personnel causes injury on shore, the AEA extends admiralty jurisdiction to that injury. Again, we disagree.
Even assuming that the Port's allegations in an affirmative defense could form the basis for jurisdiction under the AEA, the substance of these allegations is insufficient.[11] As explained above, Adamson's reliance on Gutierrez and Gebhard is unavailing because Adamson was injured by the collapse of the passenger ramp, which is an extension of land. Adamson's injuries were thus not proximately "caused by an appurtenance of a ship," Victory Carriers , 404 U.S. at 211, 92 S.Ct. 418 ; see also MLC Fishing, Inc. , 667 F.3d at 142 ; Parker , 537 F.2d at 116, making the officers' role in her injuries irrelevant to AEA jurisdiction. Therefore this case does not involve an injury "caused by a vessel on navigable waters." 46 U.S.C. § 30101.[12]
Accordingly, we hold that maritime law does not apply to Adamson's claims, and we affirm the district court's grant of partial summary judgment on that issue.
AFFIRMED.
APPENDIX
Bellingham Cruise Terminal and Passenger Ramp *1134 *1135 United States Court of Appeals for the Ninth Circuit
Office of the Clerk 95 Seventh StreetSan Francisco, CA 94103
Information Regarding Judgment and Post-Judgment Proceedings
Judgment
• This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed *1136 date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.
Mandate ( Fed. R. App. P. 41 ; 9th Cir. R. 41-1 & -2)
• The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.
Petition for Panel Rehearing ( Fed. R. App. P. 40 ; 9th Cir. R. 40-1 )
Petition for Rehearing En Banc ( Fed. R. App. P. 35 ; 9th Cir. R. 35-1 to -3)
(1) A. Purpose (Panel Rehearing):
• A party should seek panel rehearing only if one or more of the following grounds exist:
• A material point of fact or law was overlooked in the decision;
• A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
• An apparent conflict with another decision of the Court was not addressed in the opinion.
• Do not file a petition for panel rehearing merely to reargue the case.
B. Purpose (Rehearing En Banc)
• A party should seek en banc rehearing only if one or more of the following grounds exist:
• Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
• The proceeding involves a question of exceptional importance; or
• The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.
(2) Deadlines for Filing:
• A petition for rehearing may be filed within 14 days after entry of judgment. Fed. R. App. P. 40(a)(1).
• If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
• If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
• See Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
• An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-2.
(3) Statement of Counsel
• A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.
(4) Form & Number of Copies ( 9th Cir. R. 40-1 ; Fed. R. App. P. 32(c)(2) )
*1137 • The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
• The petition must be accompanied by a copy of the panel's decision being challenged.
• An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
• If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.
• The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under Forms.
• You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.
Bill of Costs ( Fed. R. App. P. 39, 9th Cir. R. 39-1 )
• The Bill of Costs must be filed within 14 days after entry of judgment.
• See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under Forms.
Attorneys Fees
• Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
• All relevant forms are available on our website at www.ca9.uscourts.gov under Forms or by telephoning (415) 355-7806.
Petition for a Writ of Certiorari
• Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov
Counsel Listing in Published Opinions
• Please check counsel listing on the attached decision.
• If there are any errors in a published opinion, please send a letter in writing within 10 days to:
• Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
• and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.
United States Court of Appeals for the Ninth Circuit
BILL OF COSTS
This form is available as a fillable version at: http://cdn.ca9.uscourts.gov/datastore/uploads/forms/Form% 2010% 20-% 20Bill% 20of% 20Costs.pdf .
Note: If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with 9th Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. § 1920, and 9th Circuit Rule 39-1 when preparing your bill of costs.
*1138 * Costs per page : May not exceed .10 or actual cost, whichever is less. 9th Circuit Rule 39-1.
** Other : Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to 9th Circuit Rule 39-1. Additional items without such supporting statements will not be considered.
Attorneys' fees cannot be requested on this form.

In a concurrently filed order, we certify to the Washington State Supreme Court a question related to the proper application of Washington law to Adamson's Washington law negligence claims. See Adamson v. Port of Bellingham , 907 F.3d 1123 (9th Cir. Aug. 13, 2018) (order).

Adamson first sued the Port in Washington state court. The Port impleaded the State of Alaska, but the trial court dismissed those claims based on Alaska's sovereign immunity, and the Washington Court of Appeals affirmed. See Adamson v. Port of Bellingham , 192 Wash. App. 921, 923-24, 374 P.3d 170 (2016). While the Port's appeal of its third-party claim against Alaska was pending, Adamson requested and received a dismissal of her state court claim without prejudice and refiled in federal court. Adamson also received workers' compensation from the State of Alaska. See Adamson , 192 Wash. App. at 924, 374 P.3d 170.

Because Adamson seeks no additional relief beyond upholding the jury's verdict, she need not have presented this claim in a cross appeal. See Jennings v. Stephens , --- U.S. ----, 135 S.Ct. 793, 798, 190 L.Ed.2d 662 (2015). Nonetheless, we consider her argument as an alternative ground on which to affirm the district court. See Cassirer v. Thyssen-Bornemisza Collection Found. , 862 F.3d 951, 974 (9th Cir. 2017).

"We use the terms 'admiralty' and 'maritime' interchangeably, as the relevant caselaw often uses both words without apparent distinction." Gruver v. Lesman Fisheries, Inc. , 489 F.3d 978, 982 n.5 (9th Cir. 2007).

28 U.S.C. § 1333 provides, in relevant part, that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

At the time The Admiral Peoples was decided, a gangplank was defined as "a long narrow moveable platform or bridge, used in entering or leaving a ship, as from a wharf." Webster's Second New International Dictionary 1032 (1934). The same definition applies today. See Webster's Third New International Dictionary 934 (2002).

Arrien arose in the context of interpreting the scope of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), see 344 F.2d at 643-44, which at the time provided compensation for injuries "occurring upon the navigable waters of the United States (including any dry dock)" for which recovery could not be provided by state law, 33 U.S.C. § 903(a) (1964). This version of the LHWCA "specifically adopted the ... line" traditionally drawn between maritime and state jurisdiction, Nacirema Oper. Co. v. Johnson , 396 U.S. 212, 220, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), making Arrien relevant to our inquiry. In 1972, Congress amended the LHWCA to extend beyond the reach of admiralty jurisdiction and cover additional employees involved in land-based operations related to marine activities. Ne. Marine Terminal Co., Inc. v. Caputo , 432 U.S. 249, 251-52, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

A "flat" is generally a "a flat-bottomed boat with a shallow draft and without keel." Webster's Third New International Dictionary 866 (2002).

Other cases have employed broad language suggesting that the gangplank rule applies whenever a connecting structure is used for loading or unloading a vessel, but in those cases the ramps were not permanently affixed to land. See White v. United States , 53 F.3d 43, 47 (4th Cir. 1995) (wooden platform bridging gap between gangway and dock); Sarauw v. Oceanic Navigation Corp. , 655 F.2d 526, 527-28 (3d Cir. 1981) (gangway falling to dock).

This conclusion is consistent with our holding in Christensen v. Georgia-Pacific Corp. , where we considered a claim that a dock owner's negligence in the construction and operation of its dock had allowed a ship to break free. 279 F.3d 807, 811 (9th Cir. 2002). A longshoreman injured his back while pulling on the ship's line to retie the ship. Id. We explained that this injury was covered by the AEA, reasoning that it "was caused by a vessel on navigable water breaking free from a dock and needing to be retied." Id. at 814-15 n.29. In Christensen , the vessel did not directly cause the injury by striking the longshoreman, but because he was injured while attempting to rein in the vessel, the vessel was clearly a proximate cause of the damage. See Grubart , 513 U.S. at 537-38, 115 S.Ct. 1043.

To the extent that Adamson contends that the Port is judicially estopped from asserting that maritime law does not apply, this argument is meritless because Adamson has not shown that "the court relied on, or accepted, [a] previous inconsistent position" of the Port, or that any of the other factors favoring judicial estoppel are present. Hamilton v. State Farm Fire & Cas. Co. , 270 F.3d 778, 782-83 (9th Cir. 2001) (internal quotation marks and citation omitted). We GRANT the Port's contested motion for judicial notice of the briefing in a related state court case, Adamson v. Port of Bellingham , 192 Wash. App. 921, 374 P.3d 170 (2016). See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank , 136 F.3d 1360, 1364 (9th Cir. 1998).

We reject Adamson's argument that maritime law applies because the passenger ramp's collapse also damaged the M/V Columbia. The locality of the tort depends on whether "the tort occurred on navigable water," In re Mission Bay Jet Sports, LLC , 570 F.3d at 1126 (citation omitted), and Adamson has provided no authority holding that damage to a ship which is on navigable water confers admiralty jurisdiction even when that damage is not part of the lawsuit. Northern Insurance Co. of New York v. Chatham County , on which Adamson relies, is inapposite because the plaintiff there sought to recover for damages to a vessel and the damage plainly occurred on navigable waters. 547 U.S. 189, 192, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006).