

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE APR 1 1 2019

CHIEF JUSTICE

This opinion was
filed for record
at 8 am on 4-11-2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT IN | ) ) ) ) | No. 96187-5<br><br>En Banc |
| SHANNON C. ADAMSON and NICHOLAS ADAMSON, husband and wife, | ) ) ) | |
| Plaintiffs-Appellees, | ) ) ) | |
| v. | ) ) | |
| PORT OF BELLINGHAM, a Washington Municipal Corporation, | ) ) ) | |
| Defendant-Appellant. | ) ) ) | |
| SHANNON C. ADAMSON and NICHOLAS ADAMSON, husband and wife, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | |
| PORT OF BELLINGHAM, a Washington Municipal Corporation, | ) ) ) | |
| Defendant-Appellee. | ) ) ) | Filed     APR 1 1 2019 |

JOHNSON, J.—The Ninth Circuit Court of Appeals certified to us a question of premises liability and a broader version of the same overarching question. The heart of the main question is whether a property owner-landlord is liable for injuries that occur on its property when the lessee has exclusive possession at the time of the accident but only priority use under the lease and the landlord has contracted to maintain and repair the premises.[1] We answer the first certified question in the affirmative and need not address the second question.

## FACTS AND PROCEDURAL HISTORY

Shannon Adamson, an employee of the Alaska Marine Highway System (AMHS), fell approximately 15 feet when the passenger ramp at the Port of Bellingham's (Port) Bellingham Cruise Terminal (BCT) collapsed. The accident caused Ms. Adamson severe, life-changing injuries.

Since 1989, the State of Alaska has leased the BCT from the Port, allowing the AMHS ferries to dock at the BCT to load and unload passengers and their vehicles. The Port and Alaska renegotiated this lease in 2009 for another 15 years. A summary of the 2009 lease provisions pertinent to this case are as follows:

---

[1] We received five amicus curiae briefs, three in support of the Adamsons (Washington State Labor Council, Inlandboatmen's Union of the Pacific, and Washington State Association for Justice Foundation) and two in support of the Port (Washington Public Ports Association, and International Council of Shopping Centers, Washington Retail Association, and Building Owners and Managers Association Seattle King County).

Section 1.2 indicates the scope of the leased premises and gives *exclusive* use of the reservation and ticketing office, the BCT manager's office, the warehouse, and the staging and purser booth to AMHS but gives *priority* use of 125 parking spaces and the marine facilities, including the vehicle ramp, *passenger ramp*, and berth 1. 3 Appellant's Excerpt of Record (ER) at 340. Section 1.3 defines "exclusive use" as "sole possession and control of the Areas," while section 1.4 defines "priority use" as a "superior but *not exclusive* right of use" and indicates the Port "may allow other uses of the priority use areas so long as such use does not unreasonably interfere with [AMHS's] use." 3 ER at 340 (emphasis added). Section 4.1 indicates that the Port will be "solely responsible for keeping the leased premises in good repair and tenantable condition," and section 4.1(a) indicates the Port will "maintain the leased premises . . . in good and substantial repair and condition." 3 ER at 343. Section 4.7 indicates the Port will "maintain the leased premises free of structural or mechanical hazards." 3 ER at 345. Under sections 5.1 and 5.3, Alaska has the right to make alterations, additions, and improvements to the leased premises subject to the "written consent of the [Port]." 3 ER at 348. Section 5.1 also requires Alaska to "permit the [Port] to enter upon the premises at all reasonable times to examine the condition of same." 3 ER at 348.

In order to allow passengers on foot to board the ferries, AMHS operates the BCT passenger ramp, which, when lowered, connects the terminal to the upper deck of the ferry. The passenger ramp is suspended with three-quarter-inch wide steel cables on a motorized pulley system that can lift and lower the ramp. Once the ramp is in place, steel pins are inserted into the ramp so that the cables are not holding all of the weight of the ramp. However, this system had a crucial flaw: the pulley system could continue to unspool the cables when the locking pins were in place, creating slack in the cables. The locking pins could then be removed with the slack in place, and the passenger ramp would fall until it caught on the cables—if the cables could withstand the force of the fall.

The Port could have fixed this flaw by installing an "interlock" system "which does not allow the slackening of the wire rope with pins still in place." 5 ER at 892. The interlock would have been a simple fix: rewiring the control panel so that the pins cannot be moved unless they were aligned properly and there was no slack in the cables. The process of interlocking the control panel would have taken an electrical engineer approximately 15 minutes and would have involved moving and installing one or two wires. This entire process would have cost less than $1,000 and prevented the 2012 incident at issue in this case. The Port decided not to implement the interlock device.

On November 2, 2012, Ms. Adamson was operating the passenger ramp and created slack in the cables. When she removed the locking pins, the ramp collapsed, snapped the cables, and she and the ramp fell approximately 15 feet until the ramp caught on the ferry. The force of the fall caused Ms. Adamson to lose consciousness such that she does not remember the accident or the events leading up to it, and she sustained multiple other life-changing injuries.

Ms. Adamson and her husband, Nicholas Adamson, sued the Port in federal court, alleging negligence and seeking damages for medical expenses, loss of wages, pain and suffering, and loss of consortium. The district court determined as a matter of law that Ms. Adamson was the Port's business invitee and instructed the jury accordingly. The case proceeded to trial and the jury awarded the Adamsons $16,007,102 in damages, determined that neither Ms. Adamson nor the State of Alaska was negligent, and found the Port negligent under three separate theories of liability: duty to a business invitee, duty as a landlord, and promise to perform repairs under the lease contract. During the case, the Port filed a motion for summary judgment, a motion for judgment as a matter of law, and a renewed motion for judgment as a matter of law, all of which the district court denied.

The Port appealed the district court's denial of its motions.[2] The Ninth

Circuit panel certified two versions of one overarching question of premises

liability to this court, one more detailed and one more broad. *See* Order of U.S.

Court of Appeals, *Adamson v. Port of Bellingham*, No. 16-35314 (9th Cir. Aug. 14,

2018) (Certification Order).

## CERTIFIED QUESTION(S)

Is party A (here, the Port) liable as a premises owner for an injury that occurs on part of a leased property used exclusively by party B (here, [AMHS]) at the time of the injury, where the lease has transferred only priority usage, defined as a superior but not exclusive right to use that part of the property, to party B, but reserves the rights of party A to allow third-party use that does not interfere with party B's priority use of that part of the property, and where party A had responsibility for maintenance and repair of that part of the property?

Perhaps stated more broadly, the question of Washington law presented is whether priority use can be considered to give exclusive control, and if so in what circumstances?

Certification Order at 10.

## ANALYSIS

A certified question from a federal court is a question of law we review de

novo. *Brady v. Autozone Stores, Inc.*, 188 Wn.2d 576, 580, 397 P.3d 120 (2017).

---

[2]The Adamsons cross appealed, alleging that the trial court erred in deciding that the circumstances of this case arise under Washington law rather than federal maritime law. *See* Second Br. on Cross Appeal at 2 (9th Cir. No. 16-35314 (2017)). The Ninth Circuit affirmed the district court's ruling. *Adamson v. Port of Bellingham*, 907 F.3d 1122, 1133 (9th Cir. 2018).

We do not consider a certified question in the abstract but instead consider it in light of the certified record from the federal court. *Carlsen v. Glob. Client Sols., LLC*, 171 Wn.2d 486, 493, 256 P.3d 321 (2011); *see also* RCW 2.60.030(2). While we present the facts from the federal court, we use them only so much as it is helpful to the analysis of the general premises liability rules implicated in the certified question.

This certified question presents us with the issue of whether possession at the time of the accident is sufficient to absolve a landowner who leases property of liability when the lease indicates that the lessee has only priority use where the injury occurred and that the landlord contractually obligated itself to maintain and repair the premises, and reserved the right to lease the property to others. We hold that a priority use provision, an affirmative obligation to maintain and repair, and the ability to lease the property to others together create sufficient control of the property such that a landowner who leases the property is held liable as a premises owner.

Proceeding to answering the question as framed, the general rule is that a landowner is held liable for injuries that occur on the land, except in some cases where the landowner gives *exclusive* control of a property over to a lessee, then the

landowner may no longer be liable as a possessor of land. *Regan v. City of Seattle*, 76 Wn.2d 501, 504, 458 P.2d 12 (1969).

However, where a landlord[3] *reserves* a duty to repair the premises, the landlord is liable for its own negligence if it fails to do so, even if both the landlord and the lessee know of the dangerous condition. Our cases have recognized this principle.

In *Rossiter v. Moore*, 59 Wn.2d 722, 370 P.2d 250 (1962), this court reversed a summary judgment dismissal of a claim by a tenant's guest for a landlord's negligence. In analyzing the issue, we noted that

> [i]f a landlord lets premises and agrees to keep them in repair, and he [or she] fails to do so, in consequence of which any one lawfully upon the premises suffers injury, he is responsible for his own negligence to the party injured. . . . And there is no distinction stated in any authority between cases of a demise of dwelling houses and of buildings to be used for business purposes. The responsibility of the landlord is the same in all cases. If guilty of negligence or other *delictum* which leads directly to the accident and wrong complained of, he is liable.

*Rossiter*, 59 Wn.2d at 726-27 (internal quotation marks omitted) (quoting *Edwards v. N.Y. & Harlem R.R. Co.*, 98 N.Y. 245, 248-49 (1885)).

This basic rule has been recognized in other contexts. In *Regan*, we analyzed a negligence action against the city and the city's lessee for an accident occurring

---

[3] The Port is both landlord and landowner; thus, the terms are interchangeable in this case.

at the lessee's go-kart race track in a city-owned building. In reversing the summary judgment, we found that although the lessee had control of the premises, a reasonable person could find that the city, by affirmatively agreeing to help clean the track between races, could have caused the accident when it negligently failed to clean a wet spot on the track. This affirmative negligence could cause the city to be liable, even though sufficient control had passed to the lessee. *Regan*, 76 Wn.2d at 503-07. Potential liability under this principle focuses on the responsibilities and control a landowner-lessor has either retained or affirmatively taken on, such as within the lease contract.

The Port relies on *Regan* and its predecessor *Hughes v. Chehalis School District No. 302,* 61 Wn.2d 222, 377 P.2d 642 (1963), as support for the assertion that once a landlord gives exclusive control, the landlord cannot be held liable. In *Hughes*, an invitee of the lessee slipped on a recessed area of the floor. In upholding summary judgment, we held that there was no defect and, thus, no duty to warn as the lessee had exclusive control of the premises for the night of the lease. *Hughes*, 61 Wn.2d at 225. But the present case materially differs from both *Regan* and *Hughes* based on the provisions of the lease. Both *Regan* and *Hughes* are premised on the assumption that there was no agreement for the lessor to repair the premises, as a commercial landlord generally has no duty to maintain or repair the premises unless the landlord assumes the duty under the lease terms. *Regan*, 76

Wn.2d at 504 ("*absent an agreement to repair by the lessor*, the lessee takes the property subject to all apparent defects" (emphasis added)); *Hughes*, 61 Wn.2d at 225 ("'*in the absence of an express warranty or covenant to repair*, there is no implied contract that the premises are suitable or fit for occupation, or for the particular use intended, or that they are safe for use'" (emphasis added) (quoting 32 AM. JUR. *Landlord and Tenant* § 654 (1941))); *see also Teglo v. Porter*, 65 Wn.2d 772, 774, 399 P.2d 519 (1965) (when a lessor agrees to repair and maintain the premises, and "acquires knowledge or notice of a condition, existing either before or arising during the tenancy, rendering the premises unsafe, . . . then the landlord is liable in tort for the injuries sustained").

While these cases discuss and analyze the correct legal principles, the general rules focus on control over the leased premises. Here, the Port affirmatively contracted to maintain and repair the premises under the provisions of the lease. No obligation under the lease existed for AMHS to maintain or repair. Further, AMHS could not make any changes to the property without the written consent of the Port, whereas the Port had the authority to unilaterally make changes to the property and was allowed to enter the leased premises at all reasonable times to examine the condition of the property. Despite the dispute over lease terms, we cannot ignore that AMHS could not repair the passenger ramp

without the authority and approval of the Port. The landowner-lessor here is liable when still holding authority over the property.

In *Jordan v. Nationstar Mortgage, LLC*, 185 Wn.2d 876, 887, 374 P.3d 1195 (2016), we examined the definition of "possession" in tort law as guidance in the context of a foreclosure. We looked to the *Restatement (Third) of Torts*, which defines a "possessor of land" as "a person who occupies the land and controls it." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 49 (AM. LAW INST. 2012). Comments c and d to § 49 go on to clarify that "[a] person is in control of the land if that person has the authority and ability to take precautions to reduce the risk of harm to entrants on the land" and explains that control over certain areas may be shared and "[e]ven a possessor who cedes temporary control of property to another may be responsible as a possessor for conditions on the land that are not in the effective control of the other because of the temporal and practical limits of the other's possession." We look to the specific terms of the agreement to see who had authority and ability to reduce risk of harm and whether there were temporal and practical limits on the lessee's possession such that the lessor is still liable as a possessor of land.

In addition to the specific terms of the lease, this rule is consistent with other sections of the *Restatement of Torts* we have previously embraced. For example, in

11

*Tincani v. Inland Empire Zoological Society*, 124 Wn.2d 121, 139, 875 P.2d 621 (1994), we opined that *Restatement (Second) of Torts* § 343 and § 343A (Am. Law Inst. 1965) are "the appropriate standard for duties to invitees for known or obvious dangers." Together, these sections require a possessor of property to exercise reasonable care to protect an invitee against a condition that creates an unreasonable risk of harm, including inspecting for said conditions, "followed by such repair, safeguards, or warning as may be reasonably necessary for [the invitee's] protection under the circumstances." RESTATEMENT (SECOND) OF TORTS § 343, cmt. b. The possessor is not liable for a condition of the land that is known or obvious to the invitee, unless the possessor "should anticipate the harm despite such knowledge or obviousness." RESTATEMENT (SECOND) OF TORTS § 343A.

Also, in *Gildon v. Simon Property Group, Inc.*, 158 Wn.2d 483, 496, 145 P.3d 1196 (2006), we embraced *Restatement (Second) of Torts* § 328E (Am. Law Inst. 1965), the predecessor to *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 49, to define a "possessor of land" as one "who occupies the land with the intent to control." In *Teglo*, we adopted *Restatement of Torts: Negligence* § 357 (Am. Law Inst. 1934), which indicates when a lessor covenants to repair the premises in a lease and because of disrepair there is unreasonable risk of injury, the lessor is liable for injuries to the lessee and others that the lessee has invited on the land. *Teglo*, 65 Wn.2d at 774-75. Together these *Restatement*

12

sections recognize a duty when a lessor has sufficient control and affirmatively covenants to maintain and repair.

In this case, the Port had access to the property to conduct maintenance; had the authority to unilaterally make changes to the property, while the lessee needed written permission; and the Port affirmatively contracted to repair and maintain with no provision requiring the lessee to repair and maintain. Based on this, the Port had the requisite ability and authority to reduce the risk of harm to entrants such that it was still in control and in possession of the property. The fact that AMHS was in berth and using the passenger ramp at the time of the incident does not affect the Port's liability as a landowner-lessor. We answer the first certified question in the affirmative.

The Ninth Circuit also certified a more abstract and broader version of the previous certified question: "[W]hether priority use can be considered to give exclusive control, and if so in what circumstances?" Certification Order at 10. Although answers to certified questions are inherently advisory in nature, because we answer the first question in the affirmative, we decline to answer the second question as too abstract.

## CONCLUSION

We answer the first certified question in the affirmative: a landowner-lessor is liable for injuries that occur due to a defect on leased property that was in exclusive possession of the lessee where the lease provisions provide that the lessee has only priority use, not exclusive use, of the premises, and that the landowner has contracted to maintain and repair the premises.

WE CONCUR: