*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRENT BECKWITH, LAURIE RENEE BECKWITH, and A.M.B., a Minor, | ) ) ) | Supreme Court No. S-18591 |
| | ) | Superior Court No. 2BA-19-00393 CI |
| Appellants, | ) ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | No. 7772 – June 6, 2025 |
| ENI PETROLEUM U.S., LLC and ENI U.S. OPERATING CO., | ) ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Utqiagvik, David L. Roghair, Judge.

Appearances: Gerald Markham, Kodiak, and Brett von Gemmingen, Law Offices of Brett von Gemmingen, Anchorage, for Appellants. Kevin M. Cuddy and Connor R. Smith, Stoel Rives, LLP, Anchorage, for Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

HENDERSON, Justice.

## I.    INTRODUCTION

A man was injured while working on a man-made island in the Beaufort Sea that served as an oil and gas drill site. One February day the man drove his forklift

down a ramp attached to the island to unload cargo from a sled sitting at or near the base of the ramp on the frozen sea. A colleague followed him, driving a wheel loader. The colleague lost control and collided with the sled and then the man's forklift, crushing the man's leg. The man sued the companies that owned and operated the island, alleging a theory of coverage under the Longshoreman and Harbor Workers' Compensation Act (LHWCA) and maritime tort jurisdiction. On cross-motions for summary judgment, the superior court dismissed the man's LHWCA claims as unripe and decided that the accident did not satisfy the two-prong test for establishing maritime tort jurisdiction. The man appeals. We reverse and remand, because the accident has a sufficient nexus to maritime activity such that it satisfies one prong of the maritime jurisdiction test, and because there was a dispute of fact over whether the accident was located in navigable waters so as to meet the other prong of the test.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Brent Beckwith's employment on Spy Island

Brent Beckwith worked on Spy Island, an 11-acre man-made island drill site in the Beaufort Sea on Alaska's North Slope. At the time, ENI Petroleum U.S., LLC (ENI Petroleum) owned the land and the oil and gas leases on Spy Island. ENI Petroleum contracted with ENI U.S. Operating Co., Inc. (ENI Operating) to conduct the "day-to-day exploration and development" of oil and gas on the island. In turn, ENI Operating signed an agreement with ASRC Energy Services E&P Technology, Inc. (AES) to provide labor and services to operate the oil fields on the island. AES employed Beckwith to provide labor on Spy Island pursuant to its contract with ENI Operating.

Beckwith worked as a "logistics equipment operator." Most of his duties consisted of loading and unloading material brought by barge or other carriers over the Beaufort Sea to the island. Between July and October, Beckwith would generally load and unload a barge or smaller landing craft that brought materials to the island. For the

remainder of the year, after the ice formed, Beckwith would typically load and unload freight onto and off of a hovercraft that moved over the frozen sea. Two months before Beckwith's accident, the hovercraft that usually transported supplies to the island was broken and needed repair. It was replaced with a tracked vehicle called a Pistenbully. Beckwith loaded and unloaded supplies onto and off of this vehicle. These supplies typically included oil drilling equipment, trash, mud, food, pipes, and other equipment.

### 2. Accident and aftermath

In February 2018 a Pistenbully left a cargo sled on the ice near Spy Island. The record is not clear as to what was on the cargo sled, but by Beckwith's account "it appeared to be drilling equipment." Beckwith drove a forklift down a ramp from the island toward the cargo sled. Beckwith circled the cargo sled, parked nearby, and started to step down from the cab. Around the same time, Beckwith's coworker started driving down the ramp in a loader. While on the ramp, the coworker lost control of the loader, and the loader struck first the sled and then Beckwith's forklift, crushing Beckwith's right leg "between the door and cab" of the forklift. The parties dispute whether the accident took place on or near the base of the ramp or beyond the shoreline of Spy Island on the frozen sea.

Beckwith was evacuated to Anchorage for surgery that resulted in his leg being amputated. He applied for worker's compensation through AES and AES began paying benefits in February 2018. In October 2019 Beckwith applied for benefits with the United States Department of Labor under the LHWCA.[1]

---

[1] 33 U.S.C. §§ 901-50. The LHWCA is a no-fault federal workers' compensation scheme for workers classified as longshoremen or working in maritime employment who are injured on navigable waters or areas traditionally used for loading, repairing, or building vessels. *See Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 415-16 (1985) (citing 33 U.S.C. §§ 902(3), 903(a)).

## B.  Proceedings

### 1.  Complaint and answer

Beckwith, his wife, and their daughter (collectively Beckwith) sued ENI Petroleum and ENI Operating (collectively ENI) in state court.  Beckwith alleged negligence in connection with the accident, loss of parental consortium, loss of spousal consortium, and vicarious liability for negligent medical care.  Beckwith claimed that the state court had jurisdiction under 28 U.S.C. § 1333(1), which governs subject matter jurisdiction over admiralty and maritime cases.[2]  ENI denied Beckwith's allegations and raised multiple affirmative defenses.

### 2.  Summary judgment motions and order

ENI moved for summary judgment.  First, ENI argued that the exclusive remedy provision under the Alaska Worker's Compensation Act (AWCA)[3] barred Beckwith from pursuing state law claims.  Second, ENI asserted that the accident lacked the maritime nexus required to establish maritime tort jurisdiction.[4]  It contended that the accident occurred between two motor vehicles that were not vessels and that the

---

[2]  *See*  28 U.S.C. § 1333(1) ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of:  (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."); *Shannon v. City of Anchorage*, 478 P.2d 815, 818 (Alaska 1970) (explaining 28 U.S.C. § 1333(1) "means that a suitor asserting an in personam admiralty claim may elect to sue in a 'common law' state court through an ordinary civil action" and that "in such actions, the state courts must apply the same substantive law as would be applied had the suit been instituted in admiralty in a federal court").

[3]  AS 23.30.001-.400.

[4]  A maritime tort claim is a federal common law claim.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-34 (1995). Establishing maritime tort jurisdiction requires a court to determine:  (1) either that the tort occurred on navigable waters, or that a vessel on navigable waters caused the accident, and (2) that there is a maritime nexus, in that the accident had a potential to disrupt maritime commerce and there is a substantial relationship to traditional maritime activities.  *Id.* at 534.

accident could not potentially impact maritime commerce because it occurred on frozen ice near an oil drilling platform with no boat traffic at that time of year. It additionally argued that the accident did not relate to traditional maritime activity because oil and gas development is not a traditional maritime activity, and because Beckwith was employed on a man-made drill site and was offloading a vehicle when the accident occurred. In support of its summary judgment motion, ENI provided affidavits describing the nature of ENI's work on Spy Island, Beckwith's duties, and the details of the accident.

Beckwith opposed ENI's motion for summary judgment.[5] He filed an affidavit explaining his job duties and the accident. He also submitted photos of Spy Island along with photos of vehicles used on or near it during different times of year, a statement from the coworker who drove the loader in the accident, and Beckwith's application for compensation under the LHWCA. Beckwith claimed that maritime jurisdiction does not necessarily require the involvement of a maritime vessel. Rather, Beckwith argued that his affidavit and photos showed that the location of the accident was a marine terminal at Spy Island, and that he was engaged in "a typical '*longshoreman*' duty" in unloading and reloading cargo, so maritime jurisdiction should apply. (Emphasis in original) Beckwith further claimed that the LHWCA should cover his claims even though he had also applied for compensation under the AWCA. He argued that the AWCA is preempted by the LHWCA and that ENI therefore was not immune from state law claims.[6]

---

[5]   Beckwith also moved for an extension of time to respond to ENI's summary judgment motion under Alaska Civil Rule 56(f). The court deemed the motion moot when Beckwith filed his opposition to summary judgment.

[6]   Beckwith further requested a ninety-day extension under Civil Rule 56(f) "to develop . . . evidence of ENI's responsibility for" the alleged negligent medical care Beckwith received. The court later dismissed Beckwith's vicarious liability claim, and he raises no arguments related to this issue on appeal.

Beckwith also filed a cross-motion for summary judgment, arguing that his accident took place on navigable waters and that maritime law controlled. He maintained that maritime jurisdiction applied because the accident occurred while he was primarily performing the longshoring activity of "loading and unload[ing] vessels."

ENI opposed Beckwith's cross-motion, asserting again that Beckwith failed to satisfy the nexus test for maritime tort jurisdiction, that the AWCA bars any state law claims, and that the LHWCA did not create any relevant cause of action or preempt the AWCA. ENI acknowledged that a genuine factual dispute existed over whether the accident met the location requirement necessary to support maritime jurisdiction, but argued that maritime jurisdiction did not apply because the accident did not have either the potential to disrupt maritime commerce or a substantial relationship to traditional maritime activity.

In response, Beckwith filed an affidavit from a worker on Spy Island who had responded to the scene of Beckwith's accident. The worker stated that when he responded to the emergency and rendered assistance, Beckwith was lying "at least 20 [feet] seaward of the Spy Island shoreline when the ocean around it is not frozen," and estimated that the collision took place 30 feet from shore. Beckwith argued that he was participating in a traditional maritime activity even though that activity occurred between two vehicles and the water was frozen. He further asserted that there is a history of maritime activity involving dog sleds traveling over frozen navigable waters in Alaska.

The court granted ENI's motion for summary judgment and denied Beckwith's cross-motion for summary judgment. It decided that Beckwith could not bring any state law claims against ENI because the AWCA's exclusive liability provision shielded ENI as a contractor or project owner. It ruled that Beckwith's claim under the LHWCA was not ripe for judicial review. It also found that he failed to satisfy the nexus prong of the test for maritime tort jurisdiction because it concluded that the accident lacked the potential to impact maritime commerce and did not have a

substantial relationship to traditional maritime activity. In determining that there was no maritime nexus, the court noted that "[h]ad the cargo sled sustained damage, actually caused the injury, or had [Beckwith] been aboard the sled when the injury occurred, the analysis would differ."

### 3. Motion for reconsideration and final judgment

Beckwith moved for reconsideration, arguing that the court had overlooked evidence indicating that the loader first hit the cargo sled, and then rolled over the sled and hit Beckwith's forklift door, crushing his leg. He argued that this information could change the court's analysis because the court must "consider whether the cargo sled [was] a vessel in maritime commerce and whether the work [Beckwith] performed was maritime in nature." Additionally he contended that the court should have reached the question of his eligibility for LHWCA benefits.

The court denied Beckwith's motion for reconsideration and issued final judgment in favor of ENI. It concluded that the sled being struck during the incident did not create maritime jurisdiction because "[w]hatever damage the sled may or may not have sustained was caused by a terrestrial vehicle and the incident was not maritime in nature — the [c]ourt could not find any reasonable or legal basis to treat this as a maritime issue."

Beckwith appeals.

## III. STANDARD OF REVIEW

"We review de novo a [trial] court's determination that maritime jurisdiction, and therefore substantive maritime law, does not extend to a tort claim."[7] We review a denial of a motion for a Rule 56(f) continuance for abuse of discretion.[8]

## IV. DISCUSSION

Beckwith argues that the superior court erred in its analysis of the LHWCA and that the accident meets the requirements for maritime tort jurisdiction. We hold that the court properly dismissed the LHWCA-related claims. However, because the accident meets the nexus requirements for maritime tort jurisdiction, and because there remains a dispute of material fact about whether the accident meets the locus requirements, we reverse the superior court's dismissal of Beckwith's maritime tort claims.

We note that while Beckwith filed in state court, both the LHWCA question and the issue of maritime tort jurisdiction implicate federal law. We therefore turn to federal precedent to help us determine the bounds of the claims he raises.

### A. The Superior Court Did Not Err In Dismissing Claims Related To The LHWCA.

Beckwith contends that the court erred in its analysis of the LHWCA because Beckwith's longshoreman status under the LHWCA supports maritime tort jurisdiction and the LHWCA preempts any AWCA defenses.

As a preliminary matter, Beckwith clarified at oral argument that he was not asking us to opine on whether he was eligible for LHWCA benefits. But because

---

[7]    *Adamson v. Port of Bellingham*, 907 F.3d 1122, 1125 (9th Cir. 2018) (citing *H20 Houseboat Vacations Inc. v. Hernandez*, 103 F.3d 914, 916 (9th Cir. 1996)); *see also State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Michelle P.*, 411 P.3d 576, 581 (Alaska 2018) ("[J]urisdictional issues are questions of law subject to [our] independent judgment." (second alteration in original)).

[8]    *McCormick v. Chippewa, Inc.*, 330 P.3d 345, 351 n.3 (Alaska 2014).

Beckwith asserts that his "status" as a longshoreman under the LHWCA establishes maritime tort jurisdiction, we clarify that the two are separate claims, with separate legal tests. A maritime tort claim is a federal common law claim,[9] whereas the LHWCA is a federal administrative regime in which a claimant may apply for benefits through the Office of Workers' Compensation Programs.[10] A claimant under the LHWCA "must satisfy both a 'status' and a 'situs' test": the claimant must be (1) "engaged in 'maritime employment,' " and (2) "the disability or death [must] result[] from an injury incurred upon the navigable waters of the United States or any adjoining pier or other area customarily used by an employer in loading, unloading, repairing, or building a vessel."[11] Additionally, the LHWCA provides exclusive liability for the employer at law or in admiralty, but does not foreclose the claimant suing other parties for damages related to the accident under federal maritime tort law or state law.[12] The LHWCA also establishes a vessel negligence cause of action under which a claimant may sue a vessel as a "third party."[13]

---

[9]     *See Grubart*, 513 U.S. at 531-34.

[10]     33 U.S.C. §§ 901-50; 20 C.F.R. § 701.201 (2024). The court determined that Beckwith's eligibility for compensation under the LHWCA was not ripe for judicial review because the LHWCA contains this federal administrative framework for determining eligibility, and because Beckwith applied for LHWCA benefits but had not yet received a determination on his eligibility.

[11]     *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 415-16 (1985) (citing 33 U.S.C. §§ 902(3), 903(a)).

[12]     *See* 33 U.S.C. § 905(a); *see also Vega-Mena v. United States*, 990 F.2d 684, 690-91 (1st Cir. 1993) ("[T]he LHWCA does not *limit* an injured worker's right to sue a third party" (emphasis in original)).

[13]     33 U.S.C. § 905(b).

Eligibility for benefits under the LHWCA does not automatically establish maritime tort jurisdiction.[14] Although there can be some overlap between maritime tort jurisdiction and the LHWCA, these two maritime remedies involve different tests for determining eligibility and jurisdiction.[15] A party seeking to invoke federal maritime tort jurisdiction must satisfy both a locus and a nexus prong pursuant to federal maritime law.[16] The locus prong requires the court to "determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water."[17] The nexus prong contains two elements. First, a court must "assess the general features of the type of incident involved" to ascertain whether the incident has "a potentially disruptive impact on maritime commerce."[18] Second, "a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. "[19] A party asserting a federal maritime tort must satisfy the locus prong and both elements of the nexus prong.[20]

---

[14]    *See Sample v. Johnson*, 771 F.2d 1335, 1344 (9th Cir. 1985) ("That Congress created statutory obligations under the LHWCA, pursuant to its maritime powers, does not mean that admiralty jurisdiction automatically attaches where a claim is made under the statute.").

[15]    *Compare Herb's Welding, Inc.*, 470 U.S. at 415-416 (requiring claimant to satisfy "both a 'status' and a 'situs' test" (citing 33 U.S.C. §§ 902(3), 903(a))), *with Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (requiring claimant to meet locus and nexus requirements).

[16]    *Grubart*, 513 U.S. at 534; *Christiansen v. Christiansen*, 152 P.3d 1144, 1146 n.3 (Alaska 2007) ("A tort case falls within admiralty jurisdiction when it satisfies the tests of 'location' and 'connection' as described by the United States Supreme Court.").

[17]    *Grubart*, 513 U.S. at 534 (citing 46 U.S.C. § 30101).

[18]    *Id.* (quoting *Sisson v. Ruby*, 497 U.S. 358, 363, 364 n.2 (1990)).

[19]    *Id.* (internal quotation marks omitted) (quoting *Sisson*, 497 U.S. at 364 & n.2, 365).

[20]    *Id.*

The superior court properly explained that "the scope of LHWCA and maritime tort differ, and because the two distinct avenues for relief require separate analyses, Mr. Beckwith's theoretical LHWCA eligibility is not a federal cause of action against ENI." Thus Beckwith's argument that his claimed eligibility for LHWCA benefits gives rise to maritime tort jurisdiction is unavailing.[21]

Additionally, the LHWCA does not preempt the AWCA. The superior court dismissed Beckwith's state law claims because the AWCA's exclusive liability provision shielded ENI as a "contractor" or "project owner" from any state law claims. Beckwith claims that the court erred, arguing that the LHWCA preempts the AWCA so that he may pursue state law claims against ENI. But the AWCA provides that "[t]he liability of an employer prescribed in [the AWCA] is exclusive and in place of all other liability of the employer . . . at law."[22] We apply "a presumption against federal preemption of state law, and preemption doctrine 'enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.' "[23] Moreover, the United States Supreme Court has held that the LHWCA "supplements, rather than supplants, state compensation law."[24] Federal courts have similarly held that the LHWCA does not preempt state law compensation schemes.[25] We therefore hold that

---

[21]    As discussed above, Beckwith also claims that the superior court failed to consider the impact of his longshoreman status on maritime tort jurisdiction. To be clear, the superior court properly dismissed Beckwith's LHWCA claims as not relevant to the question of maritime tort jurisdiction.

[22]    AS 23.30.055.

[23]    *Allen v. State, Dep't of Health & Soc. Servs.*, 203 P.3d 1155, 1160-61 (Alaska 2009) (first citing *State v. Arnariak*, 941 P.2d 154, 158 (Alaska 1997); and then quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 130 (1978)).

[24]    *Sun Ship, Inc. v. Pennsylvania.*, 447 U.S. 715, 719-20 (1980).

[25]    *See, e.g.*, *Garvin v. Alumax of S.C., Inc.*, 787 F.2d 910, 916-18 (4th Cir. 1986) (characterizing purpose of LHWCA as supplementing rather than supplanting

the LHWCA does not preempt the AWCA, and the court properly dismissed Beckwith's state law claims against ENI.

**B. It Was Error To Grant Summary Judgment On The Issue Of Maritime Tort Jurisdiction.**

Beckwith argues that the court should have granted his cross-motion for summary judgment concluding that maritime jurisdiction existed, or in the alternative, that a dispute of material fact existed such that the court should have denied ENI's summary judgment motion. The court properly concluded that a dispute of material fact existed as to the location of the accident that rendered it impossible to determine on summary judgment whether or not Beckwith satisfied the locus prong of the maritime jurisdiction test. But it was error to conclude that Beckwith did not satisfy the nexus test, and to grant summary judgment to ENI on that basis.

**1. The superior court properly concluded that a dispute of material fact existed regarding the locus prong.**

Under the locus prong for the test for maritime tort jurisdiction, the court "must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water."[26] The Admiralty Extension Act (AEA) clarified that "[t]he admiralty and maritime jurisdiction of the

---

state compensation acts); *see also James v. United States*, 470 F. Supp. 3d 1013, 1020 (D. Alaska 2020) (holding LHWCA does not preempt AWCA and its immunity provisions); *cf. Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 767-69 (Alaska 1999) (concluding federal maritime law does not preempt state statute allowing municipalities to pursue diverted-services claims against oil companies). *But see Grantham v. Avondale Indus., Inc.*, 964 F.2d 471, 472-74 (5th Cir. 1992) (deciding LHWCA preempts some state law immunities that conflict with LHWCA, while acknowledging that Fifth Circuit precedent does not address Supreme Court precedent and observing "there is a powerful argument that [the Fifth Circuit has] taken a wrong turn").

[26] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citing 46 U.S.C. § 30101).

United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."[27] Under the AEA, if a litigant claiming admiralty jurisdiction is injured onshore the "injury must have been caused by a vessel or its appurtenance."[28] "Admiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea"[29] unless a "vessel or its appurtenance" caused the accident.[30]

Here the court declined to decide the locus prong where ENI conceded that there was a dispute of fact regarding the location of the accident. Beckwith claims that the court erred both by failing to decide as a matter of law that the accident satisfied the locus prong, and also by failing to recognize that the court's locus decision may impact its application of the nexus prong. Beckwith argues that his affidavits, photos, and video of the accident show that the accident occurred "(well) beyond the Spy Island shoreline." He further notes that, despite being seasonally frozen, the Beaufort Sea is a navigable waterway. ENI responds that Beckwith failed to satisfy his summary judgment burden regarding the location of the accident. ENI argues that photographic and video evidence shows the accident occurred on a ramp that "was permanently affixed to Spy Island," which does not constitute navigable waters.

---

[27]     46 U.S.C. § 30101(a).

[28]     *Adamson v. Port of Bellingham*, 907 F.3d 1122, 1131-32 (9th Cir. 2018) (citing *Scott v. Trump Ind., Inc.*, 337 F.3d 939, 944–45 (7th Cir. 2003)); *see also Anderson v. United States*, 317 F.3d 1235, 1237 (11th Cir. 2003); *Margin v. Sea-Land Servs., Inc.*, 812 F.2d 973, 975 (5th Cir. 1987); *Kinsella v. Zim Isr. Navigation Co.*, 513 F.2d 701, 703–04 (1st Cir. 1975); *Garrett v. Gutzeit*, 491 F.2d 228, 232 (4th Cir. 1974).

[29]     *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 360 (1969).

[30]     *Adamson*, 907 F.3d at 1129, 1131-32 (observing that appurtenance is something "capable of being carried with a vessel" and not permanently affixed to shore).

We agree with the court's determination that a dispute of material fact existed regarding the maritime tort locus prong. Though Beckwith correctly observes that the Beaufort Sea constitutes a navigable waterway even though it is frozen in winter,[31] the location of this accident remains a disputed material fact. The parties submitted conflicting affidavits regarding the location of the accident. As a result, neither party established on summary judgment that the accident occurred on or off navigable waters. Given our below analysis of the other — nexus — prong of the maritime jurisdiction test, and our resulting reversal of the court's grant of summary judgment on that issue, we remand for further proceedings, including proceedings relevant to the locus prong.[32]

---

[31] *See Sanders v. Placid Oil Co.*, 861 F.2d 1374, 1377 (5th Cir. 1988) (deciding seasonal non-navigability was insufficient "to render waters non[-]navigable as a matter of law"); *Interlake S. S. Co. v. Nielsen*, 338 F.2d 879, 880, 883 (6th Cir. 1964) (concluding vessel worker who died by impact "upon the frozen waters of Lake Erie" was located on navigable waters); *Economy Light & Power Co. v. United States*, 256 U.S. 113, 122 (1921) ("Navigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water."). *See generally* 1 JOHN A. EDGINTON ET AL., BENEDICT ON ADMIRALTY § 142 (7th ed. 2024) ("Navigability need not be continuous through the year, but must be as regular as the seasons and of a duration long enough to be useful and valuable in transportation.").

[32] Because determination of the locus prong presents a jurisdictional question, the court may wish, on remand, to hold an evidentiary hearing to decide the disputed factual issues. *See Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) ("If the pleadings and other submitted materials raise . . . disputed questions of fact with regard to jurisdiction, the district court has the discretion to take evidence at a preliminary hearing in order to resolve the contested issues."); *Brooks Range Petroleum Corp. v. Shearer*, 425 P.3d 65, 71 (Alaska 2018) (explaining when trial court addresses question of venue and there are disputed facts, trial court may hold evidentiary hearing to resolve disputed facts). The parties did not litigate before us about how factual disputes regarding the locus prong should be resolved, so we do not address that issue further.

### 2. Beckwith demonstrated that the accident satisfied the maritime nexus prong of the maritime jurisdiction test.

ENI argues, and the superior court agreed, that Beckwith failed to meet his burden to provide adequate evidence of a maritime nexus so as to defeat ENI's motion for summary judgment or to support Beckwith's cross-motion for summary judgment. We disagree.

The United States Supreme Court employs a two-element inquiry to determine maritime nexus:

> A court, first, must "assess the general features of the type of incident involved," to determine whether the incident has "a potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."[33]

We conclude that Beckwith established as a matter of law that the accident met both elements of the nexus prong. Because the superior court has yet to determine the precise location of Beckwith's accident, we assume without deciding that it occurred on navigable waters for the purposes of discussing the nexus prong.[34]

#### a. The accident had the potential to disrupt maritime commerce.

In addressing this first element of the nexus prong, "[t]he jurisdictional inquiry does not turn on the *actual* effects on maritime commerce," and instead focuses on their *potential to impact* maritime commerce.[35] When assessing whether such

---

[33] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (quoting *Sisson v. Ruby*, 497 U.S. 358, 363-65 & 364 n.2 (1990)).

[34] We observe that if the superior court determines on remand that Beckwith fails to meet the locus prong of the test for maritime tort jurisdiction, the court will lack federal maritime tort jurisdiction.

[35] *Sisson*, 497 U.S. at 363 (emphasis in original).

potential exists, a court must consider "a description of the incident at an intermediate level of possible generality."[36] This properly focuses the inquiry "not on the specific facts at hand but on whether the 'general features' of the incident were 'likely to disrupt commercial activity.' "[37] This level of inquiry ensures that courts "avoid descriptions that are 'too general' such that they cannot be useful in comparing cases, or descriptions that are overly specific such that they would ignore an incident's capacity to have an effect on maritime commerce."[38]

The United States Supreme Court's precedent is instructive when determining how to apply the first element of the nexus prong. For instance, in one case the Court analyzed whether a fire that was started on a pleasure yacht docked at a marina on Lake Michigan met the first element.[39] It described the "general features" of the incident as "a fire on a vessel docked at a marina on navigable waters," and concluded that — regardless of the "*actual* effects on maritime commerce" of the fire in question — a fire of that type could potentially disrupt maritime commerce.[40] Similarly the Court decided that the first element of the nexus prong was met when two boats collided on navigable waters[41] and when an airplane crashed into a lake,[42]

---

[36] *Grubart*, 513 U.S. at 538.

[37] *Id.* (quoting *Sisson*, 497 U.S. at 363).

[38] *In re Christopher Columbus, LLC*, 872 F.3d 130, 135 (3d Cir. 2017) (citing *Grubart*, 513 U.S. at 538-39); *see also Germain v. Ficarra (In re Petition of Germain)*, 824 F.3d 258, 271 (2d Cir. 2016) ("An overly particularized description will invite future litigation over even the smallest change to the fact pattern, even if that change has little bearing on whether federal courts should or should not exercise admiralty jurisdiction.").

[39] *Sisson*, 497 U.S. at 363.

[40] *Id.*(emphasis in original).

[41] *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982).

[42] *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 255-56, 270-71 (1972).

reasoning in both cases that such accidents could create hazards and disruptions for commercial vessels in the vicinity.[43] The Court observed in the boat collision case that even though the actual accident occurred in a location that was "seldom, if ever, used for commercial traffic," the general features of the accident still satisfied the first element of the nexus prong.[44]

Here, we must first assess whether the superior court properly described the general features of the incident. The superior court characterized the accident's "general features" as "a forklift operator erroneously colliding with another worker on solid ice." Beckwith argues that this too narrowly defined the character of the accident, and we agree. A more accurate description at the "intermediate level of possible generality" is the following: a collision of cargo loading vehicles near a ramp on navigable waters causing an injury to someone unloading cargo.[45] This description captures the nature of the accident both more accurately and at a more general level.[46] It also properly disregards the cause of the accident, which should be considered when evaluating the *second* element of the nexus prong (focusing on the events leading to the accident).[47]

With that general description in mind, we conclude that this incident had the potential to disrupt maritime commerce. The superior court found that Beckwith failed to demonstrate that "the accident ha[d] the potential to impact maritime commerce" because "[a] forklift collision on solid ice is not the type of incident that

---

[43] *Sisson*, 497 U.S. at 363 (citing *Foremost*, 457 U.S. at 675 & n.5).

[44] *Foremost*, 457 U.S. at 670 n.2, 677.

[45] We again note that we assume without deciding that the accident occurred on navigable waters for the purposes of evaluating whether it meets the nexus prong.

[46] *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 539 (1995) (describing "general features" of incident as "damage by a vessel in navigable water to an underwater structure").

[47] *See id.* at 540-42.

'could lead to a disruption' of maritime commerce."[48] But properly characterized as a collision of cargo loading vehicles near a ramp on navigable waters causing an injury to someone unloading cargo, this incident had the general potential to disrupt maritime commerce, even if the "fact-specific" inquiry ENI urges us to undertake might lead to a different conclusion.[49] Federal courts have concluded that "[w]ithout a doubt, worker injuries . . . can have a disruptive impact on maritime commerce by stalling or delaying" maritime operations.[50] The type of incident under consideration here threatens to delay loading and unloading of cargo and to divert resources toward rescue operations.[51]

---

[48]  The court quoted *Grubart*, 513 U.S. at 539.

[49]  *See Sisson v. Ruby*, 497 U.S. 358, 363-64 (1990) ("Our cases thus lead us to eschew the fact-specific jurisdictional inquiry urged on us by respondents.").

[50]  *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995); *see also Minnot v. M/Y Brunello*, 891 F.3d 1277, 1283-84 (11th Cir. 2018) (deciding injury to vessel repair and maintenance worker had potential to disrupt maritime commerce); *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 299-300 (2d Cir. 2009) ("[T]here is little question that this kind of accident — the death of persons repairing and refitting a vessel — has a potentially disruptive effect on maritime commerce."); *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 982-83 (9th Cir. 2007) (deciding "an assault on a seaman by his former maritime employer aboard a vessel in navigable waters" had potential to impact maritime commerce because it could and did lead to delay and less productive fishing trips); *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 385-86 (7th Cir. 2001) (deciding injury to casino boat crew member had potential to disrupt maritime commerce); *Green v. Vermilion Corp.*, 144 F.3d 332, 334, 336 (5th Cir. 1998) (concluding there was admiralty jurisdiction when worker was injured slipping on deck of vessel while mooring and unloading it); *Solano v. Beilby*, 761 F.2d 1369, 1370-72 (9th Cir. 1985) (concluding there was maritime jurisdiction where two longshoremen were injured on ship ramp while loading car).

[51]  *See* discussion *supra* note 50.

Moreover, an incident of this type could potentially impact access to Spy Island, which implicates admiralty law's traditional concern with navigation and access to ports.[52]

We reject ENI's argument that the lack of nearby commercial activity by other vessels on navigable waters means this incident had no potential to impact maritime commerce. While it is true that the Beaufort Sea was not navigable by traditional watercraft for months before and after this accident, the proper inquiry is not whether an incident actually disrupted maritime commerce, but whether an accident of this nature "pose[s] more than a fanciful risk" to marine commerce.[53] The United States Supreme Court has held that incidents had potential to disrupt maritime commerce despite the absence of commercial vessels actually operating in the vicinity at the time.[54] Here, the fact that the accident occurred in the winter, when the water was frozen, does not preclude a potential effect on maritime commerce when viewing the incident at the proper level of generality. Beckwith's affidavit also demonstrates that cargo was in fact regularly moved by watercraft in this area during part of the year and by other vehicles during the winter. Beckwith did not provide evidence that there were actual vessels prevented from arriving at Spy Island because of this particular accident. But he was not required to do so. Instead, by showing that the accident took place in an area where cargo was regularly brought across the sea to be unloaded, Beckwith established that this incident had the potential to disrupt maritime commerce, such as

---

[52]    *See Grubart*, 513 U.S. at 539 (holding "damage by a vessel in navigable water to an underwater structure" was potentially disruptive because it "could lead to restrictions on the navigational use of the waterway during required repairs"); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674-75 (1982) (noting admiralty law's traditional concern with navigability); *Sisson*, 497 U.S. at 362 (concluding fire on noncommercial vessel at marina "has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels").

[53]    *Grubart*, 513 U.S. at 539.

[54]    *Foremost*, 457 U.S. at 670 n.2, 677; *Sisson*, 497 U.S. at 363-64.

by disrupting access to and use of the ramp at Spy Island.[55]  That potential is not destroyed by the seasonal freezing of the sea.[56]

Moreover, while the vehicles involved in maritime commerce may change with the seasons when the sea freezes, that does not mean maritime commerce ceases to exist in winter — especially where, as here, the vehicles perform functions similar to those of traditional maritime vessels.  The United States Supreme Court and federal circuit courts of appeal have decided that there is maritime jurisdiction when vessels that are not traditionally considered maritime are used to perform maritime functions.  In *Offshore Logistics v. Tallentire*, for instance, the Court held that there was maritime jurisdiction when a helicopter that was used to transport offshore oil workers to a man-made island drill site crashed into the ocean, because the helicopter "was engaged in a function traditionally performed by waterborne vessels:  the ferrying of passengers from an 'island,' albeit an artificial one, to the shore."[57]  Similarly, in *Solano v. Beilby*, the

---

[55]    *See Sisson*, 497 U.S. at 362 (holding fire on noncommercial vessel at marina had potential to disrupt maritime commerce because it could spread to nearby vessels or make marina inaccessible); *Grubart*, 513 U.S. at 539 (holding damage to underwater freight tunnel has potential to disrupt maritime commerce because it "could lead to restrictions on the navigational use of the waterway during required repairs").

[56]    *See* discussion *supra* note 31.

[57]    477 U.S. 207, 218-19 (1986) (citing *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 271 & n.20 (1972)); *see also Preston v. Frantz*, 11 F.3d 357, 357, 359 (2d Cir. 1993) (holding that there was sufficient maritime nexus for maritime jurisdiction when passenger died on high seas in helicopter crash while travelling from Connecticut to Nantucket Island); *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1111-12 (5th Cir. 1982) (concluding that there was admiralty jurisdiction in helicopter crash because "pilot was engaged in a maritime-type function, transporting persons over the seas"); *Ledoux v. Petroleum Helicopters, Inc.*, 609 F.2d 824, 824 (5th Cir. 1980) ("The crash of the deceased's helicopter, while it was being used in place of a vessel to ferry personnel and supplies to and from offshore drilling structures, bears the type of significant relationship to traditional maritime activity which is necessary to invoke admiralty jurisdiction."); *c.f. U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft,*

Ninth Circuit concluded that there was maritime jurisdiction over an accident on a ship ramp that occurred while two workers were loading an automobile onto the ship.[58] The court reasoned that while "[t]he vehicles involved—an automobile and a jitney—are not inherently indigenous to maritime commerce," they were properly viewed as "instrumentalities to" the commercial maritime function of loading vessels.[59]

Here, the cargo sled served the purpose that a waterborne vessel would during the rest of the year: carrying cargo to the island. And all of the vehicles involved in this incident — a forklift, loader, and cargo sled — were being used to perform a typical maritime function of unloading cargo.

Finally, we reject ENI's argument that this incident's relationship to an oil and gas drill site precludes it from having a potential impact on maritime commerce. The United States Supreme Court has never held that incidents related to oil and gas drilling cannot impact maritime commerce. ENI points to *Rodrigue v. Aetna Casualty & Surety Co.*, where the Court held that admiralty jurisdiction did not apply to an incident occurring on an artificial island built for oil and gas drilling.[60] But that rested

---

*Ltd.*, 582 F.3d 1131, 1141 (10th Cir. 2009) ("In this case, unlike the cases where circuit courts have applied admiralty jurisdiction, the undisputed purpose of the flight was evaluating and demonstrating the airplane. Had the airplane been unavailable, the trip would not have taken place. This case is thus distinguishable from cases involving the transportation [of] passengers between a mainland and an island."). *But see Exec. Jet*, 409 U.S. at 274 ("[I]n the absence of legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States.").

[58]     761 F.2d 1369, 1370-72 (9th Cir. 1985). We acknowledge that in *Solano* the Ninth Circuit applied a pre-*Grubart* four part admiralty jurisdiction test, but the court conducted a similar analysis to *Grubart*'s potential to impact maritime commerce test and considered the accident's connection to traditional maritime activities. *See id. Grubart*, 513 U.S. at 534.

[59]     *Solano*, 761 F.2d at 1371.

[60]     395 U.S. 352, 359-60 (1969).

primarily on the Court's conclusion that the accidents in question took place on the artificial island and involved no collision with a vessel.[61] It did not preclude finding that an incident related to oil and gas drilling but occurring in navigable waters could impact maritime commerce.[62] And the Fifth Circuit has concluded that torts involving vessel-related oil and gas drilling can impact maritime commerce, such as by delaying maritime activity.[63]

The accident here has the potential to impact maritime commerce by delaying cargo loading, limiting access to Spy Island, and diverting resources.[64] This three-vehicle collision in front of a cargo loading ramp is distinguishable from cases where the incidents in question would only impact oil and gas production, such as where an oil drilling component is damaged[65] or a platform worker or rigger is injured.[66]

---

[61] *Id.*; *see also Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 352-53 (5th Cir. 1999) (holding maritime jurisdiction did not apply to accident that "occurred entirely on" fixed drilling platform that had "no function in navigation").

[62] *Rodrigue*, 395 U.S. at 359-60.

[63] *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d 157, 161, 166 (5th Cir. 2014) (concluding oil spill from well drilled by offshore drilling rig "had a significant effect on maritime commerce"); *Scarborough v. Clemco Indus.*, 391 F.3d 660, 662, 665-66 (5th Cir. 2004) (concluding injury to sandblasting worker who performed significant portion of work on navigable water had potential to disrupt maritime commerce).

[64] *See* discussion *supra* note 50.

[65] *See Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 217 (5th Cir. 2016) (holding incident where "a component failed on an underwater structure in an offshore production installation" only had potential to impact oil and gas production, and did "not have the potential to disrupt maritime commercial or navigational activities").

[66] *See Hufnagel*, 182 F.3d at 351-52 ("*Fixed drilling platforms* do not exist for any purpose related to traditional maritime navigation or commerce." (emphasis added)); *Hicks v. BP Expl. & Prod.*, 308 F. Supp. 3d 878, 890-91 (E.D. La. 2018) (first prong of nexus test not met because offshore oil worker's injury posed no more than "a fanciful risk" to maritime commerce).

Neither the accident's proximity to an oil drilling site nor the fact that Beckwith may have been unloading drilling equipment negates this accident's potential to impact maritime commerce.[67]

We conclude that the accident here had the potential to impact maritime commerce, satisfying the first element of the nexus prong.

### b. Beckwith's accident has a substantial relationship to a traditional maritime activity.

Turning to the second element of the nexus prong, we hold that Beckwith also demonstrated that the accident has a substantial relationship to a traditional maritime activity. To determine whether a substantial relationship exists, a court must first "define the relevant activity . . . not by the particular circumstances of the incident, but by the general conduct from which the incident arose."[68] The court must then consider as a matter of law "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand."[69] The United States Supreme Court clarified that a court must "look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor."[70] The Court held that "as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will 'involve' such traditional maritime activity" and will meet the second element of the nexus prong.[71]

---

[67] *See In re Deepwater Horizon*, 745 F.3d at 161, 166; *Scarborough*, 391 F.3d at 662, 665; *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995).

[68] *Sisson v. Ruby*, 497 U.S. 358, 364 (1990).

[69] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 539-40 (1995).

[70] *Id.* at 541.

[71] *Id.*

Here, as with the first element of the nexus prong, we must first assess whether the superior court properly defined the "general conduct from which the incident arose."[72] We conclude that the court erred in using the same description of the incident for both elements of the nexus prong: "a forklift operator erroneously colliding with another worker on solid ice." That summary improperly focused on the incident itself, failing to accurately capture the "conduct from which the incident arose" for the purposes of the second element.[73] Consistent with United States Supreme Court precedent,[74] we characterize the events leading to the accident as unloading cargo near a ramp on navigable waters.

That characterization supports the conclusion that this incident has a substantial connection to maritime activity. The superior court found that Beckwith failed to establish a maritime connection, reasoning that "[a]n injury resulting from a terrestrial vehicle where the injured party was not on the cargo sled or boarding the cargo sled is not an injury involving a 'vessel' "[75] and that Beckwith could not show

---

[72]    *Sisson*, 497 U.S. at 364.

[73]    *See id.* at 364-65 (describing general conduct leading to plane sinking in Lake Erie as "air travel generally" (citing *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 269-70 (1972))).

[74]    *See Grubart*, 513 U.S. at 540 (describing examples of "general conduct" under second prong of nexus test:  "[n]avigation of boats in navigable waters, . . . storing [boats] at a marina on navigable waters, . . . flying an airplane over the water, . . . swimming, . . . . repair or maintenance work on a navigable waterway performed from a vessel" (first citing *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982); then citing *Sisson*, 497 U.S. at 367; and then citing *Exec. Jet*, 409 U.S. at 255-56, 270-71)).

[75]    The superior court initially found that the cargo sled was not involved in or harmed by the accident, and reasoned that this meant that Beckwith's injuries had no relationship to any maritime "vessel" for the purposes of maritime jurisdiction.  This was error, as the record shows that the loader struck first the sled and then Beckwith's forklift.  However, we do not address the question of whether the cargo sled is properly

that the incident was "substantially related to traditional maritime activity." Beckwith argues that the superior court erred, asserting that because Beckwith was engaged in the loading and unloading activities of a "quintessential maritime worker" and the accident occurred at a commercial marine terminal, the accident was substantially related to traditional maritime activity. ENI urges us to affirm, arguing that Beckwith failed to show a relationship to maritime activity because there were no vessels involved and Beckwith was not longshoring or stevedoring but was rather using "non-floating heavy machinery" to unload a terrestrial sled. It argues that this type of accident does not fit the rationale for admiralty jurisdiction — to handle problems of vessels and maritime commerce. Additionally, ENI contends that the activity leading to the accident was offshore oil drilling and that "[c]ourts regularly find that this type of resource development activity does not bear a substantial relation to traditional maritime activity."

We reject ENI's characterization of the events leading up to this accident and conclude that they bear a substantial relationship to maritime activity. In determining what constitutes traditional maritime activity, we look to the purpose of admiralty law.[76] The United States Supreme Court has held that the fundamental interest behind maritime jurisdiction is the general "protection of maritime commerce."[77] It has explained that this means "maritime activity" encompasses much

---

considered a maritime "vessel," as we hold that Beckwith established as a matter of law that the incident bore a "substantial relationship" to the "traditional maritime activity" activity of loading cargo. *See Sisson*, 497 U.S. at 364.

[76]     *Grubart*, 513 U.S. at 539-40.

[77]     *Sisson*, 497 U.S. at 367 (quoting *Foremost Ins. Co.*, 457 U.S. at 674-75); *The Dutra Grp. v. Batterton*, 588 U.S. 358, 376-77 (2019) (holding that "special solicitude to sailors has only a small role to play in contemporary maritime law" and that " 'fundamental interest' served by federal maritime jurisdiction [is] 'the protection of maritime commerce' " (quoting *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 25 (2004))).

more than mere navigation, extending "at least to any other activities traditionally undertaken by vessels, commercial or noncommercial."[78] For instance, it has held that "[n]avigation of boats in navigable waters," "storing [boats] at a marina on navigable waters," and "repair or maintenance work on a navigable waterway performed from a vessel" are all substantially related to maritime activity.[79] On the other hand, merely "flying an airplane over the water" or swimming in navigable waters are "too attenuated" from traditional maritime activity, absent consideration of additional factors.[80] Whether the vehicle involved in the accident is a traditional vessel under maritime law is not dispositive when determining if there is maritime jurisdiction.[81]

The activity that led to this accident — loading and unloading cargo — satisfies the second element of the nexus prong. Loading cargo has long been considered a traditional maritime activity.[82] It relates intimately to maritime law's

---

[78] *Sisson*, 497 U.S. at 367.

[79] *Grubart*, 513 U.S. at 540 (first citing *Foremost Ins. Co.*, 457 U.S. at 675; and then citing *Sisson*, 497 U.S. at 367).

[80] *Id.* (citing *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 255-56, 270-71 (1972)).

[81] *See Offshore Logistics v. Tallentire*, 477 U.S. 207, 219 (1986) (concluding there was maritime jurisdiction in helicopter crash where helicopter "was engaged in a function traditionally performed by waterborne vessels" (citing *Exec. Jet*, 409 U.S. at 271 & n.20)).

[82] *See, e.g.*, *Moser v. Tex. Trailer Corp.*, 623 F.2d 1006, 1009 (5th Cir. 1980) ("The injured party was, at the time of the injury, performing services in connection with the loading of cargo, a traditional maritime activity."); *Drachenberg v. Canal Barge Co.*, 571 F.2d 912, 917 (5th Cir. 1978) ("[T]he District Court[] . . . had maritime jurisdiction over this case because the accident occurred on the deck of the barge, which was in navigable waters at the time, the accident arising out of an incident directly connected with traditional maritime activity — the unloading of the ship's cargo."); *Edynak v. Atl. Shipping Inc. Cie. Chambon Maclovia S.A.*, 562 F.2d 215, 221 (3d Cir. 1977) ("[A]dmiralty law has traditionally been concerned with the loading and unloading of vessels.").

fundamental concern with protecting maritime commerce.[83] Here, the incident arose because Beckwith and his coworker were tasked with unloading cargo from a sled that had recently arrived after crossing the Beaufort Sea. The events leading to this accident are therefore closely tied to the traditional maritime activity of unloading cargo on navigable waters. And while the vehicles involved in the accident are not, as noted above, typical maritime vessels, the cargo sled performed the function that a barge or other watercraft would serve during other seasons. And the forklift and loader are commonly used to load and unload maritime cargo at all times of year.[84]

We also reject ENI's claim that the events leading up to the incident are properly characterized as "support for offshore oil drilling on a man-made drillsite" such that the accident lacks a substantial relationship to traditional maritime activity. In *Offshore Logistics v. Tallentire*, the United States Supreme Court held there was maritime tort jurisdiction over a helicopter accident even when the people involved worked on an offshore oil and gas platform.[85] The Court observed that because the helicopter was "engaged in a function traditionally performed by waterborne vessels" — the "ferrying of passengers" from an island to the shore — the event leading to the accident was substantially related to a traditional maritime activity.[86] The Fifth Circuit has similarly determined that the fact that work is performed for an oil company does not preclude finding that it is substantially related to a traditional maritime

---

[83] *Cf.* discussion *supra* note 77.

[84] *See Solano v. Beilby*, 761 F.2d 1369, 1370-72 (9th Cir. 1985) ("The vehicles involved—an automobile and a jitney—are not inherently indigenous to maritime commerce, but viewed as instrumentalities to a vessel loading operation, are no less common to marine commerce than to land operations."); *see also* discussion *supra* note 57.

[85] 477 U.S. 207, 218-19 (1986).

[86] *Id.*

activity.[87]   Here, while Beckwith was indeed hired to support offshore drilling operations, the event that led to the accident — unloading cargo — is squarely maritime in nature.[88]   And the fact that the cargo itself may have been drilling equipment does not alter that conclusion.[89]

Beckwith established as a matter of law that the accident has the potential to impact maritime commerce and bears a substantial relationship to maritime activity. We therefore hold that Beckwith met the nexus prong of the test for maritime tort jurisdiction, and we reverse the superior court's dismissal of Beckwith's maritime tort claims on summary judgment.[90]   Because genuine issues of material fact remain regarding whether Beckwith satisfies the locus prong of the maritime jurisdiction test, we remand for further proceedings on that jurisdictional question.

---

[87]   *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 217 (5th Cir. 2013) ("[I]ncidents which occur on jack-up rigs may bear a substantial relationship to traditional maritime activity when they arise out of or implicate the rig's movement across water."); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995) ("[T]he repair and maintenance of a jack-up drilling rig on navigable waters is certainly a traditional maritime activity.").

[88]   *See* discussion *supra* note 82.

[89]   *Cf. Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 218 (5th Cir. 2016) (holding maritime jurisdiction foreclosed where tort claims were *only* connected to oil and gas exploration, and had no connection to maritime activities).

[90]   Given this holding, we need not address Beckwith's argument that the superior court should have granted his Rule 56(f) motion for extension of time as related to his maritime tort claims.  But we note that the court did not abuse its discretion in denying Beckwith's 56(f) motion to develop evidence related to ENI's vicarious liability for negligent medical care.  Beckwith raises no claims related to negligent medical care on appeal, and the court properly dismissed his state law claims against ENI, including the vicarious liability claim, because the AWCA's exclusive liability provision shielded ENI from any state tort liability.  *See* AS 23.30.055; AS 23.30.045.

## V.   CONCLUSION

We AFFIRM the superior court's decision dismissing Beckwith's LHWCA and state law claims.   We REVERSE the court's decision dismissing Beckwith's maritime claims for lack of jurisdiction and REMAND for the court to determine whether the maritime tort locus prong is met.